# EXHIBIT A
## Part 1 of 3

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

RAYMOND ALBERT RODRIGUEZ, )
)
      Plaintiff, )
)
v. ) CIVIL ACTION
) 4:14-cv-00968
ELI LILLY AND COMPANY; )
LILLY USA, LLC; and JULIA )
DAWN RAMOS, )
)
      Defendants. )

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

ORAL AND VIDEOTAPED DEPOSITION OF

RAYMOND A. RODRIGUEZ

FEBRUARY 5, 2015

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

    ORAL AND VIDEOTAPED DEPOSITION of
RAYMOND A. RODRIGUEZ, produced as a witness at the
instance of the DEFENDANTS, and duly sworn, was taken
in the above-styled and numbered cause on FEBRUARY 5,
2015, from 9:59 a.m. to 4:17 p.m., before Stephanie M.
Harper, RPR, CSR in and for the State of Texas,
recorded by machine shorthand, at the offices of
JACKSON WALKER, L.L.P., 1401 McKinney, Suite 1900,
Houston, Texas, pursuant to the Federal Rules of Civil
Procedure and the provisions stated on the record or
attached hereto; that the deposition shall be read and
signed before any notary public.

JOB NO. 178058

1    Q.    Okay.

2    A.    The rank, I'm a captain.

3    Q.    Okay.  I wasn't sure if that was a general

4    description or the actual title.

5    A.    It's actually called the "branch."

6    Q.    Okay.  Where are you currently working?

7    A.    I'm not.

8    Q.    What were the dates of your employment with

9    Lilly?

10   A.    From December 2001 until October 17th, 2013.

11   Q.    Have you had employment since your employment

12   with Lilly ended?

13   A.    Yes, a short stint with ATR.

14   Q.    What does ATR stand for?

15   A.    I have no idea to tell you the truth.  They --

16   Automated Training something -- Resources, that's what

17   it was.  I think that's what it is.  They only went by

18   their initials.

19   Q.    What was your position there?

20   A.    I was a sales manager.

21   Q.    Who did you report to?

22   A.    Elliot Lander.

23   Q.    And what were the dates of your employment

24   there?

25   A.    Early January to late March.

1   did you file that; who do you file it with?

2       A.   With the VA.

3       Q.   Do you have any idea when it will be ruled on?

4       A.   I have no idea.

5       Q.   Okay.  Do you have any -- a military pension

6   or anything like that?

7       A.   Again, what do you mean?

8       Q.   Any type military pension, like a retirement

9   payment or anything like that.

10      A.   No.

11      Q.   Okay.  So turning to your employment at Lilly,

12  what was the first position that you held at Lilly?

13      A.   Can -- can you clarify?

14           Do you mean before I actually became an

15  employee of Lilly, or just at Lilly?

16      Q.   Well, I guess before.  I didn't realize that

17  you had -- but anytime you were associated with Lilly,

18  what was your first position?

19      A.   I was a technical writer with Computer Horizon

20  as a contractor.

21      Q.   When was that?

22      A.   2000, I think.

23           And then 18 months later, a little bit

24  after 18 months later, I was hired.

25      Q.   Who hired you?

1     A.     Nancy Fagan.

2     Q.     And what was your first position?

3     A.     The first thing they called me was a supply

4   chain associate.

5     Q.     How long did you do that?

6     A.     Let's see.  I got my ten-year-award thing, so

7   I think it was 11 years.

8     Q.     You did that for 11 years?

9     A.     Yes.  But it -- it -- the -- the actual title

10   changed.  The job stayed the same, but the title

11   changed.

12     Q.     What was the job?

13     A.     It was a procedure writer coordinator in

14   the -- maintenance and engineering.

15     Q.     Was there a particular area that you were

16   responsible for within maintenance and engineering?

17     A.     Yes.  LTC south, I guess.  We had some in

18   north, but for the most part, Lilly technical center

19   south.  Facilities, I think that's what they call it.

20     Q.     And then after 11 years, you moved on to a

21   different position?

22     A.     Yes.

23     Q.     And what was that?

24     A.     Sales, diabetes sales.

25     Q.     Did you have any complaints about how you were

1    Q.    So you made -- is it fair to say that you

2    moved into a sales role because you wanted to relocate?

3    A.    Yes.

4    Q.    Okay.

5    A.    And plus all of the folks in the veterans

6    community thought I would really do well in sales.

7    Q.    So did you actually have to apply for the

8    sales position?

9    A.    Yes.

10    Q.    And who hired you for that?

11    A.    Tom -- Thomas Bills.

12    Q.    When you moved into the sales position, was

13    that a promotion?

14    A.    I -- no, I think I got the -- I think I just

15    came in as a lateral.

16    Q.    And then did you receive sales training?

17    A.    Yes.

18    Q.    What was involved in that?

19    A.    Online training, and then classroom training.

20    Q.    How long was the training period for that

21    position?

22    A.    The online, I think was three weeks.  And then

23    the -- I'm not sure what the -- what the in-house

24    training was.

25    Q.    So according to Lilly's records, you

1    transferred to the sales rep position in 2000- -- June

2    of 2012; does that sound right to you?

3        A.    Um-hmm.

4        Q.    Okay.  Is that a "yes"?

5        A.    Yes.  Sorry.

6        Q.    I forgot to mention that --

7        A.    Okay.

8        Q.    -- another deposition rule.

9              And then after that, is that when you had

10   the sales training?

11       A.    I'm trying to remember.  I -- that sounds

12   right.

13       Q.    So in addition to the three weeks

14   approximately of online training, you also had

15   classroom training?

16       A.    Yes.

17       Q.    How long did that last?

18       A.    I can't remember.  I know it was a couple of

19   weeks at least.

20       Q.    And at some point, you were authorized to go

21   out in the field and make sales calls?

22       A.    Yes.

23       Q.    Do you remember when that was?

24       A.    After the training.

25       Q.    Do you remember any -- like month or time

1      Q.   If you go to Page 9 of 13, it looks like

2    there's some training that's occurring in 2012, in June

3    of 2012.  Quite a bit of training.  It starts on Page

4    9, and it goes to the next page.  Do you recall whether

5    you first started getting sales training around June --

6      A.   2012?

7      Q.   Yeah.

8      A.   Yes.

9      Q.   And it -- it appears that it continued on

10   through July.  Is that consistent with your

11   recollection?

12     A.   Yes.

13     Q.   Okay.  During the sales training, were you

14   given training on Lilly's promotional policies?

15          MR. AHMED:  Objection; vague.

16     Q.   (BY MS. BOSHKOFF)  You can answer.

17     A.   Apparently.  There's one that says

18   "Promotional Product Samples."

19     Q.   Sometimes Lilly employees refer to these as

20   good promotional practices or GPPs; have you ever heard

21   that reference?

22     A.   No, and I am very aware of GLPs, GMPs...

23     Q.   Okay.

24     A.   So GPP is not something that I was aware of.

25     Q.   Okay.  How about "CPP"; have you heard that at

1    Lilly?

2        A.    No.

3        Q.    Okay.  Do you recall getting trained on things

4    like -- for example, it's kind of in the middle of the

5    page here, "Business Meals with External Parties"?

6        A.    Yes.

7        Q.    Okay.  And then there's -- if you go down to

8    the bottom of the page, second from the bottom,

9    "Documenting a Sales Call"?

10       A.    Yes.

11       Q.    On the next page, there's training relating --

12   reflected relating to -- "Promotional Product Samples."

13   Did you get that training?

14       A.    Where?

15       Q.    If you go -- it's on Page 11 of 13.  It's one,

16   two -- six lines down.

17       A.    "Promotional Product Samples"?

18       Q.    Yeah.

19       A.    Is that the one you're talking about?

20       Q.    Yeah.

21       A.    Yes.

22       Q.    Did you understand that there were a series of

23   rules at Lilly's relating to how you would conduct

24   yourself as a sales representative with respect to

25   promotion of Lilly's products?

1      A.    Yes.

2      Q.    Did you have a name for that program,

3  policies, or...

4      A.    Yeah.   Following -- following the Lilly

5  guidelines for promotional policies.

6      Q.    Okay.   And you --

7      A.    I think there was a -- what was it?   There was

8  a great big group of procedures and a knowledge base to

9  go through.

10     Q.    Okay.   Do you remember what those were called?

11     A.    Not right now, no.

12     Q.    Is there any training on this that's shown as

13  you having received after June of 2012 that you don't

14  believe you actually received?   Feel free to look

15  through it.

16     A.    No, I -- I -- to the best of my knowledge, I

17  have those.

18     Q.    You did receive it?

19     A.    Um-hmm.

20     Q.    The training reflected there?

21     A.    Um-hmm.

22     Q.    Is that a "yes"?   Sorry.

23     A.    Yes.   Sorry.

24     Q.    Okay.   The first supervisor that you had in

25  the sales position was Tom Bills?

1    A.    Yes.

2    Q.    How long did you report to Mr. Bills?

3    A.    From when I started until -- I think it was

4    January.

5    Q.    So approximately June 2012 to January 2013?

6    A.    Yes.  Wait a minute.  No, that's not right.

7    It was August.  I think it was -- August 1st was when

8    we made the realignment.

9    Q.    Of 2013?

10   A.    Yes.

11   Q.    And when you reported to Mr. Bills, you were a

12   diabetes care sales rep?

13   A.    Yes.

14   Q.    Okay.  What products were you promoting?

15   A.    Tradjenta and Humalog, and Jentadueto, a part

16   of Tradjenta.

17   Q.    Are those products all for the treatment of

18   diabetes?

19   A.    Yes.

20   Q.    What does Tradjenta do?

21   A.    It treats diabetes as an oral agent.

22   Q.    And Humalog is an injectable?

23   A.    Humalog is insulin.

24   Q.    Is it injected?

25   A.    Yes.

1    Q.    And then the last one?

2    A.    Jentadueto.

3    Q.    Yeah.

4    A.    It's also an oral.

5    Q.    Do any of those products need to be

6    refrigerated?

7    A.    Yes.

8    Q.    Which ones?

9    A.    Humalog.

10   Q.    Why is Humalog refrigerated?

11             MR. AHMED:   Objection; calls for

12   speculation.

13   Q.    (BY MS. BOSHKOFF)  If you know.

14   A.    To maintain its molecular integrity before

15   it's dispensed to a physician or from a physician to a

16   patient.

17   Q.    When you sampled Humalog, did you keep it in a

18   cooler until you delivered it?

19   A.    Yes.

20   Q.    And then when you delivered it to a physician,

21   was it delivered into the physician's refrigerator?

22   A.    Most of the time.

23   Q.    Was it your understanding that it needed to be

24   kept within a certain temperature to maintain the

25   integrity of the product?

1    A.   Yes.

2    Q.   And did you have any understanding of -- of

3  what could happen to Humalog if the temperature was not

4  controlled?

5    A.   Yes.

6    Q.   And what was that?

7    A.   Well, it would be -- it's only bioavail- --

8  bioavailability would go down, but that it would still

9  be -- well, it could be held at room temperature for

10  30 days.

11    Q.   So would it lose some of its effectiveness if

12  it was not refrigerated?

13          MR. AHMED:  Objection --

14    A.  I don't know.

15          MR. AHMED:  -- calls for a medical

16  opinion.

17    A.   I don't really know if it would lose its -- I

18  don't know.

19    Q.   (BY MS. BOSHKOFF)  Okay.  That's fine.

20          Now, were you trained as part of your sales

21  training at some point regarding how to maintain proper

22  refrigeration for Humalog?

23    A.   Yes.

24    Q.   Okay.  Was there -- did you have a Lilly

25  issued refrigerator?

1     A.   Yes.

2     Q.   Actually two of them?

3     A.   Yes -- well, the other one was from another

4  sales rep who had left to another assignment.  But they

5  were both Lilly -- Lilly refrigerators.

6     Q.   And were you re- -- required to maintain the

7  samples in the Lilly issued refrigerators?

8     A.   Yes.

9     Q.   Were you trained on a temperature monitor that

10  was called a "TempTale"?

11    A.   Sort of.

12            (Exhibit No. 2 was marked.)

13    Q.   (BY MS. BOSHKOFF)  The court reporter's handed

14  you a document that's been marked as Deposition

15  Exhibit 2.  Do you recognize this as training materials

16  that you received?

17    A.   Yes.

18    Q.   Okay.  And when you say that you were -- I

19  think you said you were sort of trained.

20    A.   Um-hmm.

21    Q.   Were you trained via these written training

22  materials?

23    A.   These were given to me as material, yes.

24    Q.   And when was that?

25    A.   Well, let's see.

1           THE WITNESS:  Yeah, I'm trying.

2           MR. AHMED:  Just turn the power off.

3           THE WITNESS:  Yeah, yeah, yeah, yeah.

4  I'm working it.  There we go.

5           MR. AHMED:  Thank you.

6    A.   Okay.  Sorry.

7    Q.   (BY MS. BOSHKOFF)  We were talking about

8  Exhibit 2, and I think you said it was given to you.

9  Do you -- do you remember who gave it to you?

10          MR. AHMED:  Objection; calls for

11  speculation.

12    A.   Um-hmm.

13    Q.   (BY MS. BOSHKOFF)  Is that a "no"?

14    A.   I don't remember.

15    Q.   Okay.  And I take you don't remember when you

16  were given this document?

17    A.   No.

18    Q.   Okay.  You said -- I think you said that you

19  were sort of trained on the temperature monitor.  Can

20  you explain what you meant by that?

21    A.   Well, I was just given this document.

22    Q.   Okay.  Did you understand that you were

23  expected to read it and follow the procedures?

24    A.   Yes.

25    Q.   Do you recall when this temperature monitor

1    called the "TempTale" was rolled out?

2       A.    No.

3       Q.    Can you describe what the temperature monitor

4    did?

5       A.    To the best of my knowledge, it was supposed

6    to monitor the temperature of the refrigerator.

7       Q.    Do -- do you recall how it worked?

8       A.    No.

9       Q.    Do you recall that it had a little visual

10   alarm on it that you were supposed to check?

11      A.    Yes.

12      Q.    And what were you supposed to do if that

13   visual alarm was showing?

14      A.    Notify sample accountability.

15      Q.    If you look at Deposition Exhibit 2 --

16      A.    Um-hmm.

17      Q.    -- and if you go to Page 5 of 12 of that

18   document, there's a picture of a TempTale there.  It's

19   on Page 5 of 12.  So the page numbers are at the very

20   bottom.

21      A.    Oh, okay.

22      Q.    There you go.

23      A.    All right.

24      Q.    Is that what the TempTale looked like?

25      A.    Yes.

1   was good on the laptop -- better on the laptop, and the

2   other one was used specifically for the iPad.

3       Q.   And did you understand that the data that you

4   entered into the call reporting system was used among

5   other things to see whether you were meeting your

6   calls-per-day requirement?

7       A.   Yes.

8       Q.   Okay.  Were you given training on how to

9   document a sales call?

10      A.   Yes.

11               (Exhibit No. 3 was marked.)

12      Q.   (BY MS. BOSHKOFF)  The court reporter's handed

13  you a document marked as Exhibit 3.  Do you recognize

14  this as Lilly's policy on documenting a sales call?

15      A.   I recognize that it's a Lilly document.  It

16  looks correct.

17      Q.   Okay.  If you look at -- under the "General

18  Information," it defines in the very first bullet:  "A

19  sales call is a face-to-face interaction that meets

20  both of the following criteria:"...

21               And the first bullet is:  "Is between a Lilly

22  sales representative and an appropriate HCP

23  customer"...

24               Did you understand that --

25      A.   Healthcare provider customer, yes.

1     Q.    -- that was one requirement for a sales call?

2     A.    Um-hmm.

3     Q.    Is that a "yes"?

4     A.    Yes.  Sorry.

5     Q.    And then the next sub-bullet is:  "Includes a

6  dialogue involving one or more of the following

7  approved topics:  Lilly product(s), associated

8  solutions, appropriate brand patient(s), appropriate

9  disease state(s)."

10        Did you understand that was another

11  requirement?

12     A.    Yes.

13     Q.    Okay.  So just to summarize, did you

14  understand a sales call involved a face-to-face

15  interaction with a healthcare provider, an appropriate

16  healthcare provider, that discussed a Lilly product?

17     A.    Yes.

18     Q.    Okay.  From your standpoint as a diabetes care

19  rep, who were the approved healthcare providers that

20  you called on?

21     A.    Can you be more clear?

22     Q.    Were they only doctors, or did you --

23     A.    No.

24     Q.    -- have non-prescribers?

25     A.    No, doctors aren't the only prescribers.  So I

1    bullet to say:  "The following activities are not

2    considered a sales call."  And the second sub-bullet

3    says:  "Speaking only with an individual who is not an

4    appropriate HCP customer."

5            So did you understand that if the person was

6    not an approved or appropriate healthcare provider

7    customer, you -- you couldn't record a sales call?

8        A.    Yes.

9        Q.    If you go to the next page, there's a training

10   regarding call notes.

11       A.    Um-hmm.

12       Q.    And it says in the first bullet:  "For each

13   sales call, the sales representative must accurately

14   document the interaction in an approved sales call

15   recording system"...

16            Did you understand that was Lilly's policy?

17       A.    Yes.

18       Q.    Okay.  Did you understand that you were

19   expected to accurately document all your sales calls?

20       A.    Yes.

21       Q.    Okay.  And then the next bullet says:  "A

22   sales representative should not record any information

23   regarding an appropriate HCP customer's statements,

24   questions, or actions during a sales call outside of an

25   approved sales call recording system."

1    say some of these.  But he came from neurology.  And a

2    young lady who had gone to an HR position, she had a

3    Master's degree.  That's pretty much all I knew about

4    her.  She was talking about specific physicians and

5    what they said, and how they overcame the -- the

6    situation.

7         Q.   And this was in the chat room?

8         A.   Yes.  Or I think Dave was actually looking for

9    suggestions on what to do with a specific physician.

10        Q.   And was that also in the chat room?

11        A.   Yes.

12        Q.   Okay.  So who was participating in this chat?

13        A.   Everyone who was on the chat list, including

14   Ms. Ramos.

15        Q.   Okay.

16        A.   And I think that was specifically for the --

17   her team, because we didn't use that with Mr. Bills.

18   There was no chatting like that.  It was a requirement,

19   however, to use that chat with Ms. Ramos.

20        Q.   Okay.  Do you recall being trained on expense

21   reporting relating to business meals?

22        A.   Yes.

23        Q.   Okay.

24              (Exhibit No. 4 was marked.)

25        Q.   (BY MS. BOSHKOFF)  The court reporter's handed

1   you a document that's been marked as Exhibit 4. Do you

2   recognize this as training materials that you've

3   received?

4      A.   Yes.

5      Q.   Okay. And --

6      A.   Well, again, I have to go back and say, yes,

7   it looked like a Lilly document; however, I don't think

8   it was in this format back then.

9      Q.   Okay.

10      A.   I'm almost positive it wasn't in this format.

11  I think it was computer-based training --

12      Q.   Okay.

13      A.   -- CBT.

14      Q.   If you go to the first page of the document

15  under "Background Information," the first bullet, it

16  says: "The value of business meals, among other

17  transfers of value, provided to teaching hospitals and

18  physicians who have an active medical license must be

19  publicly disclosed as part of Lilly's Corporate

20  Integrity Agreement"...

21      A.   Right.

22      Q.   Did you understand that?

23      A.   Yes.

24      Q.   And then it goes down to the bottom of that

25  paragraph: "Accurate reporting of business meals is

1    critical for Lilly to meet these external disclosure

2    obligations."

3        A.    Right.

4        Q.    Did you understand when you were working for

5    Lilly that to allow Lilly to accurately account for the

6    amount spent on a healthcare provider at a business

7    meal, you had to report the total amount spent and also

8    the number of attendees?

9        A.    Yes.

10        Q.    And the actual attendees?

11        A.    Yes.

12        Q.    And that information was supposed to be

13    accurate?

14        A.    Yes.

15        Q.    Okay.  How did you track attendees at a

16    business meal?

17        A.    When I first got there, it was just a matter

18    of entering it electronically into a system the number

19    of physicians and non-physician attendants that were

20    healthcare providers.  So they -- they judged any of

21    the -- they wanted to know who actually came in and ate

22    while we were there.  So I entered it into a system.

23        Q.    Did that change at some point?

24        A.    Yes.  At some point, they asked for a sign-in

25    sheet so that all of the people who came in had to sign

1    their name.  And ac- -- according to most of the

2    physicians that I worked with, Lilly was the last to do

3    that.

4        Q.   Okay.  When did that happen?

5        A.   I don't know exactly.  I just know it

6    happened.

7        Q.   And so once they implemented the sign-in

8    sheet, did you understand that you were expected to get

9    people to sign in --

10       A.   Absolutely.

11       Q.   -- if they appeared for a meal?

12      'A.   Yes.

13       Q.   And that was supposed to be accurate?

14       A.   Every time.

15       Q.   And --

16       A.   As a matter of fact, I was the first one to

17   actually put the sign-in sheets together in a booklet

18   so that they could be easily accessed and then kept for

19   later -- for when the monthlies -- expense report was

20   compiled.

21       Q.   Did you --

22       A.   I gave that to not only -- I didn't just keep

23   it myself.  I gave it to other people on my team.

24       Q.   And did you submit that sign-in sheet with the

25   expense report?

1    Q.    So if somebody came in that wasn't an approved

2    healthcare provider, such as a medical assistant, and

3    took lunch, would you have them sign the sheet?

4    A.    Yes.

5    Q.    Okay.  And then would you report that that

6    person was there when you submitted your expense

7    report?

8    A.    Yes.

9    Q.    Any other ways in which the policy on business

10   meals as implemented differed from what you understood

11   the formal policy to be?

12   A.    No, that was it.

13   Q.    Okay.

14   A.    As long as I was there with them, it was good.

15   Or as long as I got access to speak with a physician,

16   that was the main goal of the lunch.

17   Q.    Okay.  To speak with the physician about a

18   Lilly product?

19   A.    Correct.  Not about vacation.

20              MS. BOSHKOFF:  Can you mark that, please?

21              (Exhibit No. 5 was marked.)

22              MR. AHMED:  Can I have a copy of that?

23              MS. BOSHKOFF:  Oh, I'm sorry.  I'm losing

24   track here.

25   Q.    (BY MS. BOSHKOFF)  The court reporter's handed

1    you a document that's been marked as Exhibit 5, which

2    is titled the "U.S. Policy on Promotional Product

3    Samples."

4         A.    Um-hmm.

5         Q.    Were you trained on this policy?

6         A.    Is it on here?  It's not the same as the one

7    that's on this BET title.

8         Q.    Do you recall being trained in general on the

9    policy on commercial product samples?

10        A.    In general, yes.

11        Q.    Okay.  If you could take a look at Page 3 of 8

12   of this training --

13        A.    Okay.

14        Q.    -- it -- the first bullet under "Storing

15   Samples" says:  "Sales representatives are responsible

16   for storing Samples in a manner that maintains product

17   stability, integrity, and effectiveness (e.g., in

18   accordance with the product's labeled storage

19   conditions); keeps Samples free from contamination,

20   deterioration, and adulteration; and protects against

21   theft."

22              Were you generally trained that that was your

23   obligation?

24        A.    I was very aware of that, yes.

25        Q.    Okay.  And if you go to the next page, it's

1    A.    Well, it was based upon my visits, based upon

2    the pres- -- prescriptions that were written that were

3    not -- that were gains.  Because it was my

4    understanding that the territory had been sliding,

5    slipping when I got there.  And that I was there to

6    help bolster the territory with the -- with the two

7    leads.

8              Because my territory at first overlapped

9    two different territories, so I had two territories to

10   cover.

11   Q.    So were Sandy Cowen and Sherell Lee both

12   working in your territory or the overlapping territory?

13   You said your territory overlapped with another --

14   A.    Both of their territories.  So I was working

15   in their territories.

16   Q.    I see.  So they each had their own territory,

17   and you were working in both of them?

18   A.    Correct.  And we communicated often about who

19   we were going to see and when.

20   Q.    And then when you reported to Ms. Ramos, did

21   you have a partner?

22   A.    No, not at first.

23   Q.    Eventually?

24   A.    Yes.

25   Q.    And who was that?

1    A.    I still can't remember the woman's name.

2    Q.    Is it Syreeta?

3    A.    That's it, Syreeta.  She had a -- Bareth --

4  Barrel, Barrow.  Something like that.

5    Q.    It's probably in here somewhere.

6    A.    She bragged to me the first day that she got

7  someone fired.

8    Q.    Do you think her last name was Barrett?

9    A.    I think so.

10    Q.    And when you worked with Syreeta Barrett, did

11  you -- the two of you have joint results -- sales

12  results?

13    A.    I don't think so.  I think it was again broken

14  out by individual --

15    Q.    Was it --

16    A.    -- well, at least I got a -- I'm sorry.

17    Q.    Go ahead.

18    A.    Forgive me.  I -- I got a specific sales

19  metric with my name on it.  And then it would indicate,

20  you know, my territory.  So I could only assume that

21  she got the same thing with her name on it.

22    Q.    Did you have the same geographic territory?

23    A.    Yes.

24    Q.    Okay.  Now, during your employment at Lilly,

25  did you take any leaves of absence?

1    A.   No.

2    Q.   Now, we were talking about conversations that

3  you had about taking a leave of absence.  Did you and

4  Ms. Ramos ever talk specifically about a leave of

5  absence?

6    A.   Yes.

7    Q.   When was that?

8    A.   Shortly before I was brought in to H- --

9  brought in before an HR rep to be fired.

10    Q.   So it was before you were discharged?

11    A.   Yes.

12    Q.   Okay.  Do you recall that you had a

13  conversation with Ms. Ramos and the human resources

14  representative on the phone where they asked you

15  questions about your activities?

16    A.   At -- my sales activities?

17    Q.   Right.

18    A.   Yes.

19    Q.   Okay.  And then at some point after that, you

20  were told you were being fired?

21    A.   Yes, October 17th.

22    Q.   So the conversation where you talked about the

23  leave of absence, was that after the first conversation

24  with Ms. Ramos in HR, but before you were actually

25  fired?

1    Q.    Okay.   Have you ever heard of a company called

2    "Sedgwick"?

3    A.    No.

4    Q.    And you said you talked to a woman on the

5    phone.   Do you recall how you got her phone number or

6    the phone number that you called?

7    A.    No.

8    Q.    Okay.   In the conversation that you had with

9    Julia Ramos where you said that you were going to be

10   submitting the paperwork, did she say anything negative

11   about the fact that you were going to take a leave or

12   that you wanted to take a leave?

13   A.    Her attitude was very negative towards me as

14   far as facial expressions and body posture.

15   Q.    Did she say anything negative?

16   A.    Well, it came off as negative.

17   Q.    I'll get to that, how it appeared.   But I just

18   want to talk about her words right now.

19   A.    Her words were, "Do what you have to do, if

20   that's what you think you have to do."

21   Q.    Okay.   And then what was it -- you said that

22   it came off as negative.   What -- what was it that

23   struck you as negative?

24   A.    Well, it wasn't quite rolling her eyes, but

25   there was that kind of dismissive behavior towards what

1    I was going through.

2         Q.    In terms of like a facial expression?

3         A.    Yes.

4         Q.    She never actually said anything dismissive,

5    did she?

6         A.    More like, "Well, you do what you have to do."

7         Q.    Okay.  And then you said --

8         A.    And that was pretty dismissive if you think

9    about it.  I mean, do what you have to do is -- it's

10   not like, you know, I'm sorry this is happening.  I

11   hope that, you know, you get better, you -- you know,

12   any kind of caring involved.  So the whole statement is

13   pretty dismissive.

14        Q.    Okay.  Do you remember anything else about her

15   mannerisms that you thought expressed negativity?

16        A.    Well, it seemed like -- you mean just from

17   that interaction, or from any other interaction?

18        Q.    We'll talk about that one, and then we can

19   move on to the others if there are any.

20        A.    Just -- there was just like a lot of sighing

21   going on on her part.  She just appeared to be not

22   very -- she didn't give -- she didn't really care.  She

23   didn't seem to care too much.

24        Q.    Okay.

25        A.    It seemed more like a -- it's my problem, not

1  hers.

2      Q.   Now, did you ever discuss with her taking a

3  leave of absence before this conversation?

4      A.   I'm not sure.

5      Q.   Okay.  Was there anything else that she ever

6  said or did that made you think that she wasn't

7  receptive to you taking a leave of absence?

8      A.   I think assigning me these other lead

9  positions were -- when I had just came to the team

10  after she had, like, I think four senior associates who

11  had no leadership whatsoever, I think that was

12  indicative of her not having concern.  The fact that

13  those four had done nothing for the team, and I was a

14  new rep as far as, you know, being out in the field and

15  in her team, I think that showed little if no regard

16  for the transition time it takes to understand what's

17  going on in the specific territory.

18      Q.   I was actually asking about anything that she

19  said or did that made you think she was not receptive

20  to you taking a leave of absence.

21      A.   That was one of them.

22      Q.   Okay.

23      A.   I think she also -- she made a point to every

24  time we had an interaction, to bring up some kind of

25  crazy political stand of what President Obama was doing

1   wrong, and how I could talk bad about him.  And I'd

2   have to tell her, that's the Commander in Chief.  I'm a

3   commissioned officer.  I'm not allowed to say anything

4   against the Commander in Chief.  That's not what I do.

5   And she'd give me this, "Oh, well, you know, would you

6   say something if you weren't in uniform?"

7      Q.  Anything else that she said or did that made

8   you think she wasn't receptive to you taking a leave of

9   absence?

10      A.  Firing me the day before or the day of that I

11   got the notification that I was approved.

12      Q.  Anything else?

13      A.  Only things I know of secondhand.

14      Q.  What do you know of secondhand?

15      A.  That she was a -- talking to folks behind my

16   back about how I was faking it, or that I had never

17   even -- or that she -- you know, she -- there

18   wouldn't -- some of the stories that I had told were

19   untrue or unreal or too -- too fantastic.

20      Q.  Who told you that Ms. Ramos was talking behind

21   your back --

22      A.  Syreeta.

23      Q.  -- about you faking it?

24      A.  Syreeta --

25      Q.  Okay.

1       A.      -- Barrett.

2       Q.      Do you remember when Syreeta told you that?

3       A.      Shortly after I told Julie about it.  So there

4    was a conversation about me concerning my medical

5    condition.

6       Q.      I see.  When was that conversation with Julie

7    about your medical condition?

8       A.      Shortly after I told Julie about it the first

9    time.  I made no --

10      Q.      No, no.  I -- I want to -- I want to ask you

11   when you first talked to Ms. Ramos about your medical

12   condition.

13      A.      Okay.

14      Q.      Relative to when you started to report it, was

15   it the first week; was it the first month?

16      A.      Probably the first month.

17      Q.      Okay.

18      A.      I mean, because Tom Bills was the one who

19   actually identified it for me.

20      Q.      So you think sometime --

21      A.      I'm sorry.

22      Q.      -- in the first month you talked to Ms. Ramos

23   about your medical condition?

24      A.      Right.

25      Q.      Do you remember roughly what you said to her?

1    A.    That I was -- I had been into -- I don't

2    actually recall, but I -- I remember that I told her

3    that I had PTSD.

4    Q.    And at some point after that --

5    A.    And that I also had a back injury, and that

6    tinnitus was a real problem for me some days.

7    Q.    And at some point after that, Syreeta told you

8    that, according to Syreeta, Ms. Ramos had told her that

9    Ms. Ramos thought you were faking it?

10    A.    Right.

11    Q.    Okay.  And that was just one time?

12    A.    She made reference to -- Syreeta made

13    reference to it a couple of times.

14    Q.    Okay.  And then you said you also heard that

15    Ms. Ramos told people that some of the stories you were

16    saying were too fantastical.

17    A.    Right.  Not reality.  Couldn't --

18    Q.    Who told you --

19    A.    -- couldn't be real.

20    Q.    -- that?

21    A.    You know, I'm trying to remember who it was.

22    Maybe it was Syreeta again.  But there was someone

23    else.  I can't remember the lady's name, but she was

24    the BI manager.

25    Q.    Okay.  The issue with -- you mentioned that

1    she had assigned you leadership roles when you first

2    came on the team?

3        A.    Um-hmm.

4        Q.    What did she assign you?

5        A.    The Tradjenta lead.

6        Q.    Is that like being product champ?

7        A.    Yes, product champ.  That's exactly it.

8        Q.    Were there any others?

9        A.    She asked me to get with some folks to do some

10   other roles, like business development, to assist them.

11   I'm trying to remember what the other one was.  I can't

12   remember right now.

13       Q.    Do you know why she assigned you the Tradjenta

14   product champ role?

15             MR. AHMED:   Objection; calls for

16   speculation.

17       A.    I have no idea.

18       Q.    (BY MS. BOSHKOFF)  Did she tell you how she

19   picked you for that?

20       A.    No.  I know that she had asked Sherell Lee to

21   do it, and Sherell declined it based on the fact that

22   she was getting to know her territory, and that the --

23   she had four executive reps who had nothing or were

24   doing nothing.

25       Q.    Did you -- did you decline the role?

1    A.    At first, yes.

2    Q.    But then?

3    A.    And then I said I would do it if I had Sherell

4    as a co-chair, co-champ.

5    Q.    And did she agree to that?

6    A.    Ms. Ramos did, but Sherell still declined.  So

7    I was de facto'd in.

8    Q.    And what did you have to do to be product

9    champ?

10    A.    Attend more meetings, do training, make sure

11    that the -- everyone was along the -- the current

12    marketing guidelines.

13    Q.    Do you recall whether Ms. Ramos assigned you

14    that role before or after you told her about your

15    medical condition?

16    A.    No, I don't recall.

17    Q.    Okay.

18    A.    I think it was after.  Yes, I'm pretty sure it

19    was after.

20    Q.    Any other conversations that you had with

21    Ms. Ramos about your medical condition or taking a

22    leave of absence, other than what we've discussed?

23    A.    I don't believe so.

24    Q.    Now, did you have any complaints about how

25    Mr. Bills treated you?

1    A.    No.

2    Q.    And I take it that you had complaints about

3    how Ms. Ramos treated you?

4    A.    Just about the PTSD, and the way she ejected

5    me from the team without -- her management style was --

6    was not the same as Mr. Bills'.

7    Q.    In what way?

8    A.    She seemed to not understand the business.  Or

9    she seemed tentative in her decisions, in that she

10   would go back and change the decision after someone got

11   in her ear and started talking to her about how bad a

12   decision it was.  She tended to lack the clarity of the

13   management decisions that were coming from above her.

14   And -- and that it seemed that Mr. Bills was able to

15   explain effectively what was going on, how things were

16   shaping up, and how we were -- what we needed to do to

17   accomplish our goals.  She on the other hand had no

18   explanation of what goals needed to be accomplished,

19   only that we needed to do better.

20   Q.    Any other complaints you had about Ms. Ramos?

21   A.    Not really.

22   Q.    Okay.  You mentioned -- I think in your

23   answer, you -- you didn't like the way she treated you

24   with respect to your PTSD.  And then you said something

25   about how she ejected you, and I'm not sure I

1    Q.   Is that a "yes"?

2    A.   Yes.

3    Q.   And then the notes here -- and I'm not saying

4  this is your answer; I'm going to ask you.  It says:

5  "Oh, was he?  Maybe I was talking to Prince then -- I

6  don't remember this particular day.  I put it in at 6pm

7  that day...was did I do that."

8    A.   ..."was did I do that."

9    Q.   "I don't really recall this whole day."

10          Does that reflect some of the remarks that

11  you made?

12    A.   Not at all.

13    Q.   Okay.  What did you say in response to the

14  question:  "Help me understand how you made the call

15  on...Dr. Killam on 8.20.2013, when it's been confirmed

16  by the office that he was out of the office on

17  vacation"?

18    A.   I made a clerical error.  That's what I said.

19    Q.   Okay.

20    A.   It very simply was, I was -- I believe I was

21  going to see Dr. Berberian.  And Dr. Berberian had said

22  15 minutes.  And in that 15 minutes, I could run up and

23  see Dr. Killam.  And then Dr. Killam -- Killam was easy

24  to see.  Go in, see him, talk to him very quickly.  But

25  he -- he may not have been there that day, but I talked

1    to Doctor -- or to the nurse practitioner, Hugh Prince.

2    I believe that's what I said. And I forgot -- but it

3    was very easy to recognize that I had seen

4    Dr. Berberian.

5              When seeing Dr. Berberian, it was a

6    simple -- it was a simple recipe for me. How I could

7    see 12 doctors at one time, was to go to buildings and

8    hit those physicians. If I forgot one, that was a

9    clerical error, and I made that very clear to them. It

10   was a clerical error that I had made when I -- I knew I

11   had Dr. Berberian's card.

12             I knew I had been up to Dr. Killam's

13   office. Doesn't necessarily mean that I was, you know,

14   trying to do something nefarious. It was trying to

15   make sure that I at least recorded the call that I

16   thought that I had made. And that one was particularly

17   an error, a clerical error.

18             Because I did see the two other nurse

19   practitioners in the 15 minutes I was there, and

20   didn't -- didn't have to record them, because they were

21   not in the system. And they -- they weren't loaded in

22   the overall system that brings them in. So they

23   weren't -- they weren't -- their licenses weren't yet

24   -- weren't yet in the Texas system, or something to

25   that effect.

1    Q.   So in this conversation, you admitted the

2    information in your call notes was inaccurate, but

3    stated that you considered it a clerical error?

4    A.   I admitted that it could be incorrect.

5    Q.   Well, was it or wasn't it?

6    A.   I admitted that it could be incorrect.

7    Q.   Do you know --

8    A.   I don't know if he was on vacation that long,

9    no -- those two weeks.

10   Q.   So you admitted, "Well, maybe it's incorrect,

11   but if it is, that's a clerical error"?

12   A.   Probably, yes.

13   Q.   Okay.  Now, if you go down sort of two-thirds

14   of the way through the document -- oh, by the way, who

15   were the two nurse practitioners that you say were not

16   in the system yet?

17   A.   There was a woman, an African woman.  And I

18   know she was from Africa, because she had facial

19   scars -- scarring.  And a -- I'm trying to remember.  I

20   think there was another brunette woman that I spoke to.

21   She was also a nurse practitioner, if I'm not mistaken.

22   Q.   So who were the two nurse practitioners that

23   were not in the system at this point in time?

24   A.   Those two.

25   Q.   And do you remember their names?