# EXHIBIT A
## Part 2 of 3

1   remember this one.

2     Q.   Okay.  It indicates that there were thir- --

3   14 people listed on the sign-in sheet, but there was an

4   expense report indicating 20 attendees.

5     A.   Oh, if that happened, that may have been

6   because they had given me a number of 20 for people who

7   would be there.

8     Q.   Do you recall being asked about that?

9     A.   Not in particular, no.

10     Q.   Are you saying you don't know whether it was

11  or wasn't asked?

12     A.   Yes.

13     Q.   Okay.  Do you understand it would be a

14  violation of Lilly's policies to put an expense report

15  in for 20 people when only 14 people were there?

16           MR. AHMED:  Objection; hypothetical.

17     A.   How -- how -- how is that supposed to -- if

18  that's information given to me by the office, how am I

19  supposed to do that?  The office tells me how many

20  people are supposed to be there.  If I under order,

21  then people go without.  The physicians go without.

22           People get angry.  So explain to me --

23  no, I can't ask you a question, right.

24     Q.   (BY MS. BOSHKOFF)  I'm just asking whether --

25     A.   I don't -- I don't think -- if anything, I

1   would give the office manager the document to get it

2   signed by who was there.  I don't understand that as

3   being against Lilly policy.  As a matter of fact, I'm

4   pretty sure as long as I got the signatures of the

5   people who were there, I did my due diligence to ensure

6   that I was following Lilly policy.

7       Q.   Okay.  Even if you put on your expense

8   reporting that there were 20 people there when there

9   were only 14?

10      A.   My due diligence was done in order to order

11  enough for what I was told would be there.  So, yes.  I

12  did nothing wrong.

13      Q.   Okay.

14      A.   And if I'm not mistaken, the doctor is also

15  charged for that, or at least the -- they're identified

16  in the Sunshine Act as being paid for those

17  particular -- or it's identified that the value is

18  ascribed to that physician for those 20 meals.

19      Q.   If you look to the top of Page 11, it says --

20  the comments are -- one of the comments are:  "There's

21  not enough pages -- there must be more pages"...

22          Did you make that comment?

23      A.   I don't know.  I don't remember that.

24      Q.   And then it says:  "[talking to himself --

25  what did I do?]"

1      Q.    Okay.  And then the next question is:  "Please

2    describe your understanding of the US Policy on

3    Promotional Product Samples"...

4              Were you asked about that?

5      A.    Yeah, I think so.

6      Q.    Okay.  If you go to the next page, near the

7    top, it says:  "Please describe your understanding of

8    the CIQ document that describes the set up and

9    requirements for the TempTale device."

10             Were you asked about that?

11     A.    Yes.

12     Q.    And then there's some comments here.

13             "Once you get it -- follow directions --

14   stabilized."

15             Did you say something like that?

16     A.    No, I read the document for them.

17     Q.    Okay.  The comment recorded here is:  "Check

18   it every day to ensure you don't have an alarm."

19             Did you say something like that?

20     A.    That was part of the process --

21     Q.    Okay.

22     A.    -- the procedure.

23     Q.    As far as the TempTale device?

24     A.    Yes.

25     Q.    So part of the process was to check it every

1    day to make sure you didn't have an alarm?

2        A.    Yes.

3        Q.    Okay.  And then it says:  "If you do have an

4    alarm, download data and call CIQ."

5            Did you say that?

6        A.    Possibly, I'm not sure.

7        Q.    Okay.  And then there's a question:  "Were you

8    trained on how to properly install and use your

9    TempTale monitor?"

10            Were you asked that question?

11        A.    No.

12        Q.    Okay.  And then there's a question:  "How were

13    you trained?"

14            Were you asked that question?

15        A.    No.

16        Q.    "When were you trained?"

17            Were you asked that question?

18        A.    No.

19        Q.    Okay.  Then there's a question:  "Has your

20    TempTale monitor alarm ever gone off?"

21            Were you asked that?

22        A.    I think so, yes.

23        Q.    Okay.  And did you respond that it had not?

24        A.    Right.  I did not believe that it did.

25        Q.    Okay.  Did you also say:  ..."but I have seen

1    pictures what it looks like when it does"?

2        A.    Yes.

3        Q.    Okay.  And then there's a statement:  "Have

4    you ever told anyone that it has gone off and you just

5    ignore it [verbatim]?"

6        A.    No.

7        Q.    Were you asked that question?

8        A.    I believe so, yeah.

9        Q.    And your response was, "No"?

10       A.    Correct.

11       Q.    And then there's a comment here:  "But I told

12   one of my engineer friends -- we would ignore it if

13   it [verbatim] went off."

14       A.    No, that is absolutely wrong.

15       Q.    You did not make that comment?

16       A.    I talked to one of my engineer friends.  I did

17   not make that comment.  What I did tell them, I talked

18   to my engineer friends, and he had told me that the

19   TempTale system was faulty.  And that everything to do

20   with the system was faulty.  So that what he would --

21   his suggestion was something to the effect of, "If we

22   had it here, we'd ignore it."

23                I don't think that was a suggestion.  It

24   was more of like what they would do with it.

25       Q.    Who was this?

1    A.    I can't remember.  It was somebody over at

2  Lilly corporate.

3    Q.    Did you repeat that comment to anyone?

4    A.    I don't think so.  I think I had conversations

5  with other people about the TempTale system, which kind

6  of made it clear that the TempTale system was faulty

7  and rolled out incorrectly, and that it wasn't rolled

8  out to all reps, and that its capabilities were

9  inaccurate.

10    Q.    But you don't believe that you repeated the

11  comment that your friend had made, which was if it

12  happened -- "If I saw it, I'd just ignore it"?

13    A.    I don't think so.

14    Q.    Okay.  So in this conversation, you -- you --

15  in response to -- questions said that your monitor had

16  not ever gone off?

17    A.    Right.

18    Q.    Okay.  Do you recall any other discussion that

19  you had in this conversation around the TempTale

20  monitor?

21    A.    Well, this:  "If yes, when did it go off," and

22  what steps did you take, none of that was said.

23          "Did you use any...product samples after

24  the alarm went off," none of that was said.

25          If, no, pull up his card report -- call

1    A.    It didn't necessarily mean that you could --

2    you needed to stop sampling.  It meant that you had to

3    send that information in.

4    Q.    Right.  And she didn't tell you to do anything

5    different?

6    A.    She told me to make it work.

7    Q.    Right.  Okay.

8          And then at some point during this

9    conversation, did they actually go look at your

10   refrigerators, or did you and Julie?

11   A.    After this conversation.

12   Q.    Okay.  So how did that occur?

13   A.    (Pauses.)

14   Q.    Did somebody say, "Okay, we're going to go

15   look at the refrigerators"?

16         Now, how did that happen?

17   A.    I think the -- the meeting was over, and they

18   were going to -- they wanted to see those TempTale

19   monitors.

20   Q.    Okay.  So did Julie ask you to go see it?

21   A.    Yes.

22   Q.    Were you actually at your house when this

23   happened, or did you have to drive over to the storage

24   facility?

25   A.    We drove over to the storage facility.  This

1     A.    I don't remember.  But, you know, I felt very

2    wounded, if you will.

3     Q.    Okay.  Now, do you recall how Julie asked you

4    to go inspect your -- your storage unit?

5     A.    I think it was very flippant the way she did

6    it now that I recall now.  "Well, let's go look at

7    your" -- "your storage facility."

8     Q.    And then the two of you drove there

9    separately?

10    A.    She drove with her security detail, and I

11   drove in my car.

12    Q.    And then what happened when you got there?

13    A.    We went up to the -- we went up to the locker,

14   opened it up, and pulled out the TempTales.  Then

15   downloaded the -- the information.  After each one of

16   them, there was one spike.

17    Q.    Meaning the alarm had gone off?

18    A.    Once.

19    Q.    Do you recall when the alarm had gone off?

20    A.    It was as they were being installed.  So early

21   on in the TempTale.

22    Q.    Do you understand that after the alarm goes

23   off once, it can't go off again?

24    A.    No.

25    Q.    Do you know whether that's true?

1   A.   Don't know.

2   Q.   Okay.

3   A.   Like I said, the training was very poor.

4        (Exhibit No. 8 was marked.)

5   Q.   (BY MS. BOSHKOFF)   Okay.   The court reporter's

6   handed you a document that's marked as Exhibit No. 8.

7   A.   Okay.

8   Q.   Have you seen these before?

9   A.   In a fleeting way, yes.

10  Q.   Okay.   You actually had two TempTales because

11  you have two refrigerators?

12  A.   Correct.

13  Q.   Okay.   And both --

14  A.   But I was only supposed to have one TempTale.

15  Q.   Both of them were in alarm status; is that

16  right?

17  A.   Yeah, according to this.

18  Q.   And then if you look at the first page, if you

19  look at the -- sort of the dotted line across --

20  A.   Um-hmm.

21  Q.   -- the bottom of the chart --

22  A.   Right.

23  Q.   -- do you see that with respect to this one,

24  there had been three different temperature violations?

25  A.   According to this chart, yes.

1     Q.   But did you not tell Ms. Ramos and Ms. Popa

2  during this meeting that you checked it every single

3  day?

4     A.   Yeah.

5     Q.   Okay.  So you checked it every single day, and

6  yet you didn't notice --

7     A.   Didn't notice it.  Correct.

8     Q.   -- that it had alarmed back in June?

9     A.   Didn't notice it.

10    Q.   Okay.  Do you know whether -- did you -- did

11  you tell them that, "I" -- "oops, I just didn't notice

12  it"?

13    A.   I don't recall saying "oops."

14    Q.   Did you say, "I didn't notice it"?

15    A.   No.

16    Q.   Did you give any explanation for why it showed

17  an alarm, and yet you hadn't notified the company of

18  the alarm?

19    A.   Again, please.

20    Q.   Did you give any explanation for why it showed

21  an alarm, and yet you hadn't reported that the TempTale

22  was registering an alarm?

23    A.   I can't remember exactly.  No, I can't

24  remember.  Sorry.

25    Q.   Okay.  Do you remember any other discussion

1    Q.   And what did the two of you discuss?

2    A.   What was going on and why.

3    Q.   What did you say --

4    A.   I think I did discuss it with Tom Bills. But

5 I don't think I was -- actually was able to talk to him

6 until after I was fired.

7    Q.   Okay. When you talked to him about it, what

8 did you tell him, and what did he say?

9    A.   Well, I told him -- I told him they fired me,

10 and how could I go from high successful to being fired,

11 and that how could I go from doing all the right things

12 the way I was trained, to being told I'm out of

13 compliance and doing whatever I wanted to.

14          I told him it's just -- it's not right

15 when -- well, I mentioned Sandy Cowen, who didn't come

16 to work for three months, and I was holding down that

17 territory all by myself. It's not right that a high

18 performer gets submarined by somebody who doesn't have

19 any respect for the company or the business.

20    Q.   Are you talking about Syreeta?

21    A.   If you'd like. Her and Julie, both of them.

22    Q.   And what did he say?

23    A.   I don't remember what Tom said, because I was

24 more distraught over the fact that I had been dismissed

25 from a job that I had made into who I was, part of

1   seemed so convenient to all of a sudden come up with

2   these issues once I identified myself as having

3   posttraumatic stress.

4      Q.   Okay.  Anything else?

5      A.   I can't think of anything right now.

6      Q.   Now, you had mentioned earlier that you told

7   Ms. Ramos that you were going to take a leave of

8   absence after you had an incident when you went to -- I

9   believe it was the emergency room.

10     A.   Yes.

11     Q.   Okay.  So sometime after that incident where

12   you went to the emergency room, that's when you first

13   told Ms. Ramos, "I'm going to take a leave of absence"?

14     A.   Yes.

15     Q.   Okay.  And it was -- you went to the VA?

16     A.   The Veterans Administration.

17     Q.   Okay.  Kind of a lengthy treatment note.

18     A.   PTSD is very complex.

19           (Exhibit No. 9 was marked.)

20     Q.   (BY MS. BOSHKOFF)  Okay.  The court reporter

21   has handed you a document that's been marked as

22   Exhibit 9.  And I'll represent to you that this is a

23   treatment note that's in your medical records.

24     A.   Um-hmm.

25     Q.   And this references an incident where you

1    state that you were on the verge of -- of killing some

2    other people and had --

3        A.    Myself.

4        Q.    Okay.  Is this the incident that you're

5    referring to?

6        A.    Yes.

7        Q.    Okay.

8        A.    It's one of them.

9        Q.    So -- and this is the incident where you went

10   to the emergency room, and after that, you told

11   Ms. Ramos that you were going to take a leave?

12       A.    Yes.

13       Q.    Okay.  This is dated September 18, 2013.  Is

14   that consistent --

15       A.    That sounds right.

16       Q.    Okay.  So your conversation with Ms. Ramos

17   about taking a leave was at some point after then?

18       A.    It could have been before as well.  I'm not

19   really sure.

20       Q.    Okay.

21       A.    Because this is one of -- the one -- this

22   was -- there had been other, because there was one in

23   May.  As you can read down there, an issue in May that

24   took -- that scared me quite a bit.

25       Q.    Let me give you another document.

1   where it -- where it -- I believe it had gotten out of

2   hand for me.

3       Q.   So it was --

4       A.   That -- it was an urgent need.

5       Q.   Sometime between September 18, 2013, and

6   October 17, 2013, you submitted paperwork?

7       A.   I would imagine so.

8       Q.   Okay.  And you believe you still have a copy

9   of that?

10      A.   Yes.

11      Q.   Okay.  Do you believe --

12      A.   Because I think all that was necessary was to

13  have them fax -- or have the physician fax back a

14  signed copy, and everything was ready to go at that

15  point.

16      Q.   Okay.  Now, I think --

17      A.   Yeah.  Because that's -- I -- I was in the

18  office, in the doctor's office, to -- was it -- I can't

19  remember.  I think I was there -- I can't remember

20  exactly why I was there, but...

21      Q.   Okay.

22               (Off-the-record discussion.)

23               (Exhibit No. 11 was marked.)

24      Q.   (BY MS. BOSHKOFF)  The court reporter's handed

25  you a document that's marked as Exhibit 11.  And

1     supposed to falsify calls, right?

2         A.    I don't false -- I didn't falsify calls.

3         Q.    Okay.  So you understood Lilly's policy in

4     that regard?

5         A.    Right.

6         Q.    And you knew that your expense reports

7     relating to lunches were supposed to be accurate?

8         A.    And they were, as far as I knew.

9         Q.    So you understood Lilly policy in that regard?

10        A.    Right.

11        Q.    And you knew that you were supposed to be

12    monitoring the TempTale?

13        A.    And I did.

14        Q.    So you understood the Lilly policy in that

15    regard?

16        A.    Um-hmm.

17        Q.    So none of those issues had to do with anyone

18    telling you, "Don't follow Lilly policy; don't need to

19    do it that way"?

20        A.    Say again?

21        Q.    None of those issues had to do with anyone

22    telling you, "No need to follow Lilly policy; that's

23    not how we do it out in the field"?

24        A.    Isn't that what I said?  I mean, I think I was

25    pretty clear with like, you know, it's just a matter

1      A.    No.   I don't think.   But once they told me

2   there was nothing they could do or that they had no

3   programs in place.

4      Q.    Okay.

5                  (Exhibit No. 13 was marked.)

6      Q.    (BY MS. BOSHKOFF)   The court reporter's handed

7   you a document that's been marked as Deposition

8   Exhibit 13.   Most of this is duplication.   So I'm not

9   going to ask you about the same allegations.   But if

10  you could take a look at Page 6, Paragraph 40 of the

11  complaint alleges that:   "Plaintiff took time off for

12  treatment and care of PTSD."

13               I understand you didn't draft this, but did

14  you ever actually get a leave approved for PTSD?

15     A.    Yes.

16     Q.    That was right before you were fired?

17     A.    Yes.

18     Q.    Okay.   So you're talking about something that

19  happened right around the same time period in which you

20  were fired, like within a few days?

21     A.    Day of, yes.

22     Q.    Oh, the day you were fired, you were told that

23  you could take a leave?

24     A.    Yes.

25     Q.    Okay.   I just didn't know if there was a prior

1    Q.   After you were interviewed?

2    A.   No.  No --

3    Q.   Was it before you were interviewed?

4    A.   -- I didn't call --

5    Q.   Okay.

6    A.   It was before I was interviewed.

7    Q.   Okay.  And when you called HR, do you recall

8    whether you called to complain about your partner?

9    A.   No, I don't recall.

10   Q.   Do you recall specifically what you said to HR

11   when you complained?

12   A.   No --

13   Q.   Okay.

14   A.   -- I don't recall.

15   Q.   Other than that, do you -- are you aware of

16   any instance where you may have complained or opposed

17   discriminatory conduct?

18   A.   I don't -- I'm very much one of those people

19   who opposes distrimin- -- discriminatory conduct.  But

20   I can't think of when I would have reported any of it.

21   Q.   Okay.

22   A.   I'm very much a do-it-now kind of -- this --

23   this is not fair.

24   Q.   Okay.  If -- if you go to Page 9, Paragraph

25   62, it's talking about retaliation here.  My

1    relevant information is Sherell Lee.

2        A.    Um-hmm.   Yes.

3        Q.    What information do you think Ms. Lee has

4    that's relevant to your claims?

5        A.    Oh, she could corroborate the use of extra

6    security in moving the meeting, and -- as well as

7    Syreeta continuingly hounding her to find out whether

8    or not she was calling me during the meeting.  She

9    could corroborate the TempTale not being given to her

10   as a rep.  That there were -- well, that she was being

11   hunted by Ms. Barrett.  Let's see.  That Julie could

12   not tolerate my condition.  I think that's about it.

13            Oh, she could also corroborate that I was

14   very well liked by my physicians, and that I did my job

15   very effectively.

16       Q.    How often would you do sales calls with

17   somebody else?

18       A.    Well, I tried to do it at least every other

19   week.

20       Q.    That you would do it with one of your

21   partners?

22       A.    Yeah.

23       Q.    Okay.

24       A.    I -- I liked to make sure that I was doing --

25   because we'd share lunches.

1    medication?

2       A.    I -- I think it's controlled by medication.

3       Q.    Okay.   That's the only medical condition

4    you're suffering from right now; is that correct?

5       A.    Only mental medical condition.

6       Q.    Okay.   And during your employment with Lilly,

7    I know you don't remember exactly when, but at some

8    point, you were diagnosed with having PTSD?

9       A.    Right.

10      Q.    At that point, how was PTSD impacting you?

11      A.    I don't understand the question.

12      Q.    How was it -- I mean, I know you're taking

13   medication now so you -- it may have been different

14   back then.   But what were the symptoms of it, and how

15   was it impacting your work, for example?

16      A.    I'm still having trouble with the question.

17            Before I knew it was PTSD or when --

18      Q.    No, once you were diagnosed with it.

19      A.    Once I knew it was PTSD.

20      Q.    Yeah.

21      A.    Once I knew it was PTSD, I think the -- the --

22   I had -- I had trouble sleeping, but I don't think that

23   really -- I don't allow -- I didn't allow anything to

24   impact my work.   I was very -- my family life was

25   suffering.

1    Q.   But as far as work, you felt like you -- you

2    didn't allow it to impact work?

3    A.   I couldn't allow it to impact work, because I

4    felt like that was what I was -- I was here to help

5    people.  And helping people -- helping people with

6    diabetes, I'm incredibly passionate about that.

7    Because people in my family have passed from the

8    effects of diabetes.

9    Q.   Okay.  I don't want to pry too much, but just

10   as it might be relevant to some issues in this case.

11            At that time when you were first diagnosed

12   with PTSD -- D, just in general, how was it impacting

13   your personal and family life?

14   A.   Well, it made a lot of sense as to what had

15   been happening in my personal and family life.

16   Q.   Okay.

17   A.   It made a lot of sense of that I wasn't -- I

18   wasn't all -- I guess I -- I'm trying to -- I'm trying

19   to frame this correctly so that it -- one of the things

20   you have to remember is that when you're in denial

21   about PTSD, you're in denial about suicide.  And that

22   for the longest time, I was afraid to admit that that's

23   what I wanted to do.  I was afraid to admit that I

24   couldn't do everything that I wanted to do to help

25   people.  And so it made it, for my ex-wife, impossible

1   to live with me.

2      Q.   Because you were in denial?

3      A.   I don't know exactly what she thought of it,

4   but I knew that she would have rather me go back to --

5   on another deployment than stay home.

6      Q.   Okay. Well, what were the specific symptoms

7   that you had when you first found out you had PTSD?

8      A.   The best way I can describe it is by telling

9   you what happened the first time that I recognized it.

10   I felt like I was having a heart attack. I felt

11   hypervigilant to the -- I thought we were being

12   attacked in my house.

13      Q.   Okay.

14      A.   I broke out into a cold sweat. I just -- I

15   was disoriented. It was -- I was searching everywhere

16   for a radio, because that was my -- that was my weapon,

17   a radio and a -- you know, a rifle and a pistol. But

18   since I didn't have those two, I was looking for a

19   radio.

20      Q.   Okay.

21      A.   And I scared just about -- my dogs were

22   scared, and my roommate at the time was -- he just

23   couldn't understand what was going on, and I couldn't

24   either.

25      Q.   So would it be fair to say that the symptoms

1    of PTSD were episodic, not continuous, that you would

2    have an episode like the one you just described?

3        A.   Yes.

4        Q.   Okay.  Did you -- did you ever have one of

5    those when you were working at Lilly?

6        A.   The one -- the first one I had, I thought I

7    was getting over it.  And I went to work, and I still

8    thought I was having a heart attack.  So I went to the

9    EHS, and they put me on a -- an ambulance and sent me

10   to a -- the hospital.

11       Q.   Okay.  Other than that, did you ever have any

12   episodes while working at Lilly?

13       A.   No.

14       Q.   Okay.

15       A.   Never.

16       Q.   In -- have you ever been diagnosed with any

17   other emotional or mental condition, other than the

18   PTSD?

19       A.   ADD.

20       Q.   Okay.

21       A.   Yeah.

22       Q.   When was that?

23       A.   When my son was 10.

24       Q.   Okay.  Did you ever take any medication for

25   that?

1   Q.   Okay.  Was this -- was October 17th, 2013, is

2   that the date that shows on the first page?

3   A.   Yes.

4   Q.   Was that the date that you asked -- was that

5   the date that you received this form?

6   A.   I received something else on --

7   Q.   On October 17th?

8   A.   Yes.  The day I was fired, I received a -- a

9   different form that was already filled out, and all it

10  needed was -- no, I -- it didn't need anything.  It was

11  the approval, I believe.  And I had the physician fax

12  the signature confirming my diagnosis.

13  Q.   Okay.  So were there -- do you recall

14  receiving or filling out any forms requesting FMLA

15  leave prior to October 17, 2013 --

16  A.   Over the --

17  Q.   -- with Eli Lilly?

18  A.   Over the phone, yes.

19  Q.   When was that?

20  A.   I'm not sure.  But it was right in time with

21  this -- going into the mental health -- this doesn't

22  seem right.  But it would be right before this, when I

23  went in right -- or at the same time.

24  Q.   And what month would that be?

25  A.   That is September.

1    Q.    Of 2013?

2    A.    Yes.

3    Q.    Okay.  So -- so in September 2013, it's your

4    testimony that you filled out another form requesting

5    FMLA leave; is that what you're saying?

6    A.    Yes.

7              MS. BOSHKOFF:  Objection; leading.

8    Q.    (BY MR. AHMED)  Okay.  And do you recall what

9    that -- whether -- whether that form was different from

10   this one?

11   A.    No, because I was doing it with this lady over

12   the phone.  I don't recall.

13   Q.    Okay.  So there was no form?

14   A.    Right.  She was doing it over the phone.  She

15   was taking all the intake information over the phone.

16   Q.    Oh, okay.  Did she give you any kind of a

17   reference number pertaining to that telephone call?

18   A.    Actually, I -- I have the form that was sent

19   to me.

20   Q.    After the telephone conference --

21   A.    Yes.

22   Q.    -- conversation?

23   A.    Yes.

24   Q.    Do you have the form?

25   A.    I -- yes, I believe so.  And I'll have to find

| Title: | Refrigerator Job Aid |
|---|---|

| Document Number: | USCIQ-TL-413-001-003-Kenmore-Refrigerator-TempTaleJob_Aid.DOCX-1174 |
|---|---|

| Version: | Approvers – Date (YYYY-MM-DD) and Time Approved. |
|---|---|
| 0 | Jamie K Steinmetz - 2013-06-28T10:24:04<br>Christopher D Parker - 2013-06-28T14:29:31 |

Status (at print):

Effective

Effective Date:

2013-08-01T00:05:15

If you are using a printed copy of this document, check that the version number is consistent with the current version number located in the Regulus Documents System MI&CS Central Instance. This page does not display more than 25 approval signatures or signatures obtained outside the system. Refer to local standard operating procedures for additional information.

*Lilly*

Answers That Matter.

CONFIDENTIAL

Rodriguez
EXHIBIT NO. 2
S. HARPER

Tool: USCIQ-TL-413-002-003, Kenmore 253.61522 Refrigerator Setup & Usage and TempTale Installation & Usage

SOP: USCIQ-SOP-413-002, Ordering and Receiving Samples

 *Lilly*

# Customer Information Quality System Tool

# Kenmore 253.61522 Refrigerator Setup & Usage and TempTale Installation & Usage

## 1.0 Audience

The intended audience of this document is:

☒ Sales Representatives  ☐ MHS Field-Based Personnel  ☐ Other: _____
☐ Sales Management  ☐ MHS Field-Based Management

## 2.0 Important Information

### 2.1 Requirements

The temperature in your Kenmore Refrigerator 253.61522 must be kept at the appropriate temperature to ensure the quality of the drug product samples and ultimately the safety of our patients. It is important to follow all requirements of this job aid when setting up your refrigerator and implementing the temperature monitoring program, in addition to the requirements that must be adhered to for receiving and storing samples.

| ID/TITLE | REQUIREMENT | RATIONALE |
|---|---|---|
| 2.1.1 Refrigerator Ordering | ☞ Complete BET ID #445369 *Kenmore 253.61522 Requirements* after reading this job aid.<br>NOTE: It is only necessary to complete the BET one time.<br><br>☞ Complete USCIQ-TL-413-002-002 *Refrigerator Order Form* in its entirety and submit the form according to its instructions.<br>NOTE: If there are any specific requests for delivery (e.g. basement, second floor, etc.) those must be noted on the refrigerator order form.<br><br>NOTE: Two TempTale®4 temperature monitoring devices will be sent to you when the refrigerator order is processed. Upon receipt, do not start either TempTale®4. One TempTale®4 will be placed in your refrigerator for temperature monitoring; it will be started as part of the installation/setup process as described in section 3.2 *Installation of TempTale®4*. The second will be held as a backup monitor, should the monitor in your refrigerator alarm. Keep the backup monitor in a designated location so it is readily available if needed.<br><br>☞ Await contact from the local delivery company to determine a date for delivery to the location specified on the order form | Completing the BET ID indicates that you understand the requirements and process steps contained in this job aid and will enable you to order your refrigerator. Lilly business decision.<br><br>Completing the order form will begin the process of getting your refrigerator. |
| 2.1.2 Refrigerator | ☞ The refrigerator must be installed in a controlled | Refrigerators are designed to function in controlled temperature environments. If |

For Internal Use Only; Not for Use in Product Detailing  

Confidential

LLY-ROD0000567

2013-09-18T14:42:30 Confidential

Document is Effective as of 2013-08-01T00-05:15, Printed On:

Tool: USCIQ-TL-413-002-003, Kenmore 253.61522 Refrigerator Setup & Usage and TempTale Installation & Usage

SOP: USCIQ-SOP-413-002, Ordering and Receiving Samples

 *Lilly*

| ID/TITLE | REQUIREMENT | RATIONALE |
|---|---|---|
| Location and Setup | temperature environment, meaning, an environment in your home or storage unit that is capable of heating and cooling as necessary to maintain the samples within the labeled temperature requirements. | the temperature is above or below manufacturer's recommended range, the refrigerator will not function properly. Manufacturer recommendation. |
| | NOTE: If you do not have adequate heating/cooling to maintain a temperature range of 59-86°F, or adequate space available within your residence you will be allowed to expense a storage unit to meet the requirements of your refrigerator | Refrigerators are designed to be plugged directly into an outlet to avoid the fire risk from using an extension cord. Manufacturer recommendation. |
| | Setup the refrigerator according to section 3.1 *Refrigerator Setup and Equilibration.* | |
| | Install the TempTale®4 according to section 3.2 *Installation of the TempTale®4.* | |
| | Monitor and adjust the temperature in the refrigerator according to section 3.3 *Temperature Monitoring and Controls.* | |
| | Complete BET ID #445370 *Kenmore 253.61522 Set Up Confirmation* to indicate your refrigerator has been setup according to this job aid. NOTE: It is only necessary to complete the BET one time. | |
| | Contact Sample Compliance at 1-800-222-INDY to arrange a refrigerator inspection. | |
| | The refrigerator must not be stored in a garage. | |
| | Do not use an extension cord. | |
| 2.1.3 Temperature Monitoring | Upon completion of the refrigerator setup and equilibration, the TempTale®4 must be installed and operational at all times. | The temperature in the refrigerator needs to be consistently monitored to ensure product quality. Lilly business decision. |
| | Install the TempTale®4 according to section 3.2 *Installation of the TempTale®4.* | Checking daily for alarms on the TempTale®4 ensures that any samples exposed to temperature excursions are not disbursed. Lilly business decision. |
| | Monitor the TempTale®4 **daily** prior to sampling to be sure it has not alarmed. The TempTale®4 must show a reading of between 4°C and 12°C. | |
| | NOTE: Make minor adjustments as indicated in section 3.3 *Temperature Monitoring and Controls* in | |

Document is Effective as of 2013-08-01T00:05.15. Printed On: 2013-09-18T14:42:30 Confidential

    

Confidential LLY-ROD0000568

Tool: USCIQ-TL-413-002-003, Kenmore 253.61522 Refrigerator Setup & Usage and TempTale Installation & Usage
SOP: USCIQ-SOP-413-002, Ordering and Receiving Samples

| ID/TITLE | REQUIREMENT | RATIONALE |
|---|---|---|
| | order to maintain temperature within this range.<br><br>NOTE: If the TempTale®4 goes out of the required temperature range, it will alarm. There are no settings on the TempTale®4 to change.<br><br>Respond to refrigerator alarms according to section 3.4 *Temperature Alarms*.<br><br>DO NOT start the TempTale®4 until it is installed in the refrigerator. | |
| 2.1.4<br>Ordering Refrigerated Samples | Samples may be ordered after the following activities are complete:<br>• Successful refrigerator inspection<br>• BET ID #445370 – Kenmore 253.61522 Set Up Confirmation.<br>• Verification that the refrigerator has maintained the desired temperature range of between 4°C and 12°C for approximately 3 hours | Completing the refrigerator inspection indicates that the location of your refrigerator is appropriate. Completing the BET indicates that your refrigerator has been setup in accordance with this job aid. Refrigerator temperature needs to be within the desired range of 4°C and 12°C to ensure product quality. Lilly business decision. |
| 2.1.5<br>Adding Product to the Refrigerator | Samples may be stored on the wire shelf except in the middle back area which is directly under the blower.<br><br>Samples may be stored on the solid shelf and in the space where the drawer was removed. | Refrigerator temperature needs to be within the desired range of 4°C and 12°C to ensure product quality. Lilly business decision.<br><br>The area below the blower of the refrigerator is too cold to store samples, as determined during refrigerator study. Lilly business decision.<br><br>Storing samples in the refrigerator with the appropriate air gap ensures proper air flow. Lilly business decision. |

For Internal Use Only; Not for Use in Product Detailing

Confidential

LLY-ROD0000569

| ID/TITLE | REQUIREMENT | RATIONALE |
|---|---|---|
| |  There must be approximately a two inch air gap between the wall of the refrigerator and any stored drug sample product throughout the refrigerator. This includes the back wall of the refrigerator. | |
| | Do NOT store any drug product samples on the back of the wire shelf in the middle section (i.e. below the blower). | |
| | Do NOT store any drug product samples on the door of the refrigerator. | |
| 2.16 Temperature Alarms | Follow the steps described in section 3.4 "Temperature Alarms if an alarm displays on the TempTale4.

NOTE: The alarm is a visual alarm and not an audible alarm | An alarm bell icon means the temperature in the refrigerator went out of range and that a temperature excursion has occurred

Samples cannot be distributed |

Confidential

LLY-ROD0000570

Document is Effective as of 2013-08-01T00:05:15, Printed On: 2013-09-18T14:42:30 Confidential

Tool: USCIQ-TL-413-002-003, Kenmore 253.61522 Refrigerator Setup & Usage and TempTale Installation & Usage
SOP: USCIQ-SOP-413-002, Ordering and Receiving Samples



| ID/TITLE | REQUIREMENT | RATIONALE |
|---|---|---|
| | • TempTale®4 showing an alarm.<br>• The alarm bell icon appears if the TempTale®4 has alarmed<br><br>Do not sample products stored in the refrigerator if an alarm displays on the TempTale®4. | because they were exposed to temperature excursions. Lilly business decision. |

### 2.2 Recommendations

There are no additional recommendations for this procedure.

Document is Effective as of 2013-08-01T00:05:15. Printed On: 2013-09-18T14:42:30 Confidential



Confidential

LLY-ROD0000571

Tool: USCIQ-TL-413-002-003. Kenmore 253.61522 Refrigerator Setup & Usage and TempTale Installation & Usage
SOP: USCIQ-SOP-413-002. Ordering and Receiving Samples

 *Lilly*

## 3.0 Process

### 3.1 Refrigerator Setup and Equilibration

Follow the steps below to install, equilibrate, and setup the interior of the refrigerator. These steps must be completed prior to installing the TempTale®4 in the refrigerator.

| STEP | ACTIVITY | RESPONSIBLE PARTY |
|---|---|---|
| 1 | Identify an appropriate location to install for refrigerator. | Sales Representative |
| 2 | Upon receipt of the refrigerator, install the refrigerator per the installation manual sent with the unit. | Sales Representative |
| 3 | Place the wire shelf in the middle position/middle rung. The shelf must be in the middle position. | Sales Representative |
| 4 | Remove the lower drawer. IMPORTANT: Leaving the drawer in place restricts airflow and prevents the refrigerator from complete circulation of airflow. NOTE: Do not remove the solid shelf. The drawer must be removed. | Sales Representative |
| 5 | Set the temperature control setting of the refrigerator at approximately "10:00" as on a clock face. | Sales Representative |

Page 6 of 12
For Internal Use Only; Not for Use in Product Detailing

Document is Effective as of 2013-08-01T00:05:15, Printed On: 2013-09-18T14:42:30 Confidential

Tool: USCIQ-TL-413-002-003, Kenmore 253 61522 Refrigerator Setup & Usage and TempTale Installation & Usage
SOP: USCIQ-SOP-413-002, Ordering and Receiving Samples



| STEP | ACTIVITY | RESPONSIBLE PARTY |
|---|---|---|
| |  | |
| 6 | Set the temperature control setting of the freezer on 'normal'. | Sales Representative |
| 7 | Equilibrate the refrigerator for a minimum of 24 hours. After the equilibration period, open the refrigerator and ensure it has cooled. | Sales Representative |

### 3.2 Installation of TempTale®4

Follow the steps below to install the TempTale®4 in the refrigerator.

| STEP | ACTIVITY | RESPONSIBLE PARTY |
|---|---|---|
| 1 | Complete the steps in section 3.1, Refrigerator Setup and Equilibration prior to installing the TempTale®4. Ensure the refrigerator is equilibrated (cooled) prior to proceeding. | Sales Representative |
| 2 | Identify the following location on the wall of the refrigerator: • Bottom left of the refrigerator • Approximately two inches (2") above the front edge of the solid shelf. Attach the TempTale®4 to wall in this location by using the adhesive attached to the back of the TempTale®4. IMPORTANT: The TempTale®4 must be placed only in this location. | Sales Representative |

Document is Effective as of 2013-08-01T00:05:15, Printed On: 2013-09-18T14:42:30 Confidential

    

Confidential

Tool: USCIQ-TL-413-002-003, Kenmore 253.61522 Refrigerator Setup & Usage and TempTale Installation & Usage
SOP: USCIQ-SOP-413-002, Ordering and Receiving Samples



| STEP | ACTIVITY | RESPONSIBLE PARTY |
|---|---|---|
| | Required TempTale®4 placement<br><br>IMPORTANT: **Do not** yet start the TempTale®4. | |
| 3 | After placing the TempTale®4 in the appropriate location of the refrigerator, activate the TempTale®4 according to the steps on the TempTale®4 operational card. | Sales Representative |
| 4 | Close the refrigerator door. Allow the TempTale®4 to equilibrate for approximately 30-45 minutes prior to proceeding to section 3.3 *Temperature Adjustment and Monitoring*. | Sales Representative |

### 3.3 Temperature Adjustment and Monitoring

Upon completion of refrigerator setup and equilibration and installation of the TempTale®4, it is necessary to monitor the temperature in the refrigerator and adjust the temperature controls as needed.

| STEP | ACTIVITY | RESPONSIBLE PARTY |
|---|---|---|
| 1 | Observe the temperature on the TempTale®4. Based on the following, adjust the temperature control setting in the refrigerator as indicated. | Sales Representative |

| IF Observed Temperature on TempTale®4 is... | THEN... |
|---|---|
| 4°C or less | The refrigerator is too cold.<br><br>Adjust the temperature control approximately ¼ inch or less toward the "9:00" position on the clock (turning the dial toward the word "Cold"). |
| 12°C or more | The refrigerator is too warm.<br><br>Adjust the temperature control approximately ¼ inch or less toward the "11:00" position on the clock (turning the dial toward the word "Colder"). |

| STEP | ACTIVITY | RESPONSIBLE PARTY |
|---|---|---|
| 2 | Allow the refrigerator to equilibrate for approximately 4-6 hours before making additional changes.<br><br>IMPORTANT: Do not open the door of the refrigerator during the equilibration period. | Sales Representative |

For Internal Use Only; Not for Use in Product Detailing

     

Document is Effective as of 2013-08-01T00:05:16, Printed On: 2013-09-18T14:42:30 Confidential

LLY-ROD0000574

Tool: USC/Q-TL-413-002-003, Kenmore 253 61527 Refrigerator Setup & Usage and TempTale
Installation & Usage
SOP: USCIO-SOP-413-002, Ordering and Receiving Samples



| STEP | ACTIVITY | RESPONSIBLE PARTY |
|---|---|---|
| 3 | Continue to refine the temperature control setting as described in step 2, above, until the temperature reads between 4°C and 12°C. <br> You will now monitor the refrigerator to ensure it stays within range for the next three (3) hours. Proceed with the next step. | Sales Representative |
| 4 | Observe the temperature for three (3) consecutive readings over a three (3) hour period <br><br> **IF...** / **THEN...** <br><br> The observed temperature is within the required range of 4°C and 12°C / Samples may be placed in the refrigerator according to the requirements described in section 2.1.3 *Adding Product to the Refrigerator*. <br><br> The refrigerator is not within the required range of 4°C and 12°C / <br> • Adjust the temperature according to step 1, above and monitor the refrigerator as described in 2-4, above <br> • Repeat this process 3 times or until such time as the temperature remains in range for 3 consecutive readings over a 3 hour period <br><br> The required range of 4°C and 12°C is not obtained after 3 consecutive adjustments. <br><br> **IMPORTANT:** The refrigerator must operate within range to store samples. <br> • Adjust the temperature control 1 full inch toward "Cold"/"Colder" to ensure the controller is functioning properly. <br> • If after 4-6 hours, there is no discernible difference in temperature then remove the TempTale4 from the refrigerator and immediately stop the TempTale4 from monitoring by pressing the Stop button. <br> • Submit the alarm data as described in section 3.4 *Refrigerator Alarms*. Submitting the alarm data will prompt a new backup TempTale4 to be sent to you <br> • Advise your manager and order a replacement refrigerator. | Sales Representative |
| 5 | Observe the temperature on the TempTale4 each day. Observe the temperature prior to removing samples for sampling and at the end of the day prior to placing samples back in the refrigerator. | Sales Representative |

Confidential

Page 9 of 12
For Internal Use Only: Not for Use in Product Detailing

LLY-ROD0000575



Tool: USCIQ-TL-413-002-003, Kenmore 253.61522 Refrigerator Setup & Usage and TempTale Installation & Usage
SOP: USCIQ-SOP-413-002, Ordering and Receiving Samples

### 3.4 Temperature Alarms

If the TempTale®4 goes out of the required temperature range, it will alarm (the alarm bell icon will be displayed). In the event of an alarm follow the steps below.

| STEP | ACTIVITY | RESPONSIBLE PARTY |
|---|---|---|
| 1 | DO NOT sample any product stored in the refrigerator. | Sales Representative |
| 2 | Observe the temperature on the TempTale®4. Based on the observed temperature, adjust the temperature control setting in the refrigerator as indicated below until the observed temperature reads between 4°C and 12°C: | Sales Representative |

| IF Observed Temperature on TempTale®4 is... | THEN... |
|---|---|
| 4°C or less | The refrigerator is too cold.<br><br>Adjust the temperature control approximately ¼ inch or less toward the "9:00" position on the clock (turning the dial toward the word "Cold"). |
| 12°C or more | The refrigerator is too warm.<br><br>Adjust the temperature control approximately ¼ inch or less toward the "11:00" position on the clock (turning the dial toward the word "Colder"). |

| STEP | ACTIVITY | RESPONSIBLE PARTY |
|---|---|---|
| 3 | After adjusting the setting, allow the refrigerator to equilibrate for approximately 4-8 hours before making additional changes.<br><br>IMPORTANT: Do not open the door of the refrigerator during the equilibration period.<br><br>IMPORTANT: If the TempTale®4 has alarmed, it will continue to show an alarm state until it is replaced. DO NOT replace the TempTale®4 at this time. | Sales Representative |

Document is Effective as of 2013-08-01T00:05:15. Printed On: 2013-09-18T14:42:30 Confidential

     

Confidential

Tool: USCIQ-TL-413-002-003, Kenmore 253.61522 Refrigerator Setup & Usage and TempTale Installation & Usage
SOP: USCIQ-SOP-413-002, Ordering and Receiving Samples

*Lilly*

| STEP | ACTIVITY | | RESPONSIBLE PARTY |
|------|----------|--|-------------------|
| 4 | Continue to refine the temperature during the next 4-6 hours, adjusting the control setting as needed until the observed temperature reads between 4°C and 12°C. | | Sales Representative |
| | **IF...** | **THEN...** | |
| | The temperature is adjusted to within the required range of between 4°C and 12°C within 24 hours | Remove the TempTale®4 from the refrigerator and immediately stop the TempTale®4 from monitoring by pressing the Stop button. | |
| | | Install the backup TempTale®4 per the instructions in section 3.2 *Installation of the TempTale®4*. | |
| | | 🔲 IMPORTANT: Do not start the new TempTale®4 device until it is installed in the refrigerator. | |
| | | Activate the TempTale®4 according to the steps on the TempTale®4 operational card and close the refrigerator door. | |
| | | Observe the TempTale®4 3 times over a 3 hour period to ensure it remains within range. | |
| | The temperature is not adjusted within the required range of between 4°C and 12°C within 24 hours | Remove the TempTale®4 from the refrigerator and immediately stop the TempTale®4 from monitoring by pressing the Stop button. | |
| | | Install the backup TempTale®4 per the instructions in section 3.2 *Installation of the TempTale®4*. | |
| | | 🔲 IMPORTANT: Do not start the new TempTale®4 device until it is installed in the refrigerator. | |
| | | Activate the TempTale®4 according to the steps on the TempTale®4 operational card and close the refrigerator door. | |
| 5 | Download the data from the alarmed TempTale®4 to elilily@sensitech.com per the TempTale®4 operational card. | | Sales Representative |
| 6 | Discard the alarmed TempTale®4. | | Sales Representative |
| 7 | You will be contacted by Customer Information Quality (CIQ) with further instructions. | | Sales Representative |

Document is Effective as of 2013-08-01T00:05:15, Printed On: 2013-09-18T14:42:30 Confidential



Confidential

Tool: USCIQ-TL-413-002-003, Kenmore 253.61522 Refrigerator Setup & Usage and TempTale
Installation & Usage
SOP: USCIQ-SOP-413-002, Ordering and Receiving Samples

 *Lilly*

## 4.0 Version History

| VERSION LABEL | REASONS FOR REVISION |
|---|---|
| 0 | New tool |

Document is Effective as of 2013-08-01T00:05:15, Printed On: 2013-09-18T14:42:30 Confidential



Confidential

LLY-ROD0000578



Answers That Matter.

## US Policy on Documenting a Sales Call

**Policy Statement** – Employees must comply with all applicable laws, regulations, government or court orders or decrees, and company policies regarding documenting a sales call between sales personnel and an appropriate Health Care Provider.

**Business Need** – To set forth a policy and procedures regarding documenting a sales call between sales personnel and appropriate Health Care Providers to foster compliance with all applicable laws, regulations, government or court orders or decrees, and company policies.

**Scope** – This policy applies to all US-based employees who are required to record sales calls.

**Definitions** – Click here for definitions of the following terms: External Party, Health Care Provider (HCP), Licensed Prescriber, Promotional Materials, Sales Personnel, Sample.

### General Information

- A sales call is a face-to-face interaction that meets both of the following criteria:

  o  Is between a Lilly sales representative and an appropriate HCP customer (i.e., a licensed prescriber meeting brand-approved territory-to-physician (TTP) rules or a non-prescribing HCP who is involved in patient care, as designated by local leadership).

  o  Includes a dialogue involving one or more of the following approved topics: Lilly product(s), associated solutions, appropriate brand patient(s), appropriate disease state(s).

- The purpose of a sales call is to provide an appropriate HCP customer with approved information related to Lilly product(s), associated solutions, appropriate brand patient(s), and/or appropriate disease state(s) to allow the HCP customer to choose the best therapy for the HCP customer's patients.

- The following activities are not considered a sales call:

  o  Dropping off promotional material and/or Lilly samples without having a discussion with an appropriate HCP customer.

  o  Speaking only with an individual who is not an appropriate HCP customer.

  o  Phone call with an appropriate HCP customer.

  o  Social or personal interaction with an appropriate HCP customer.

  o  Written correspondence with an appropriate HCP customer.

    NOTE: Any written communication from sales personnel containing a (brand or generic) product name/therapeutic class or a disease state is considered promotional and must be approved through the Promotional Materials Approval Process. (See the US Policy on Promotional Materials.)

CONFIDENTIAL
Eli Lilly and Company

Confidential

US Policy on Documenting a Sales Call
Page 1 of 2



Rodriguez
EXHIBIT NO. 3
S. HARPER

LLY-ROD0001138

## Call Notes

- For each sales call, the sales representative must accurately document the interaction in an approved sales call recording system (e.g., Structured Call Note (SCN)) or other documentation system approved by the appropriate business unit.

  ○ A "call" will be credited only for appropriate interactions with appropriate HCP customers.

- A sales representative should not record any information regarding an appropriate HCP customer's statements, questions, or actions during a sales call outside of an approved sales call recording system. However, if it is absolutely necessary to create any other records (e.g., personal logs), the sales representative is personally accountable for complying with the company document retention policy and must submit these records to corporate upon request.

## Handling Confidential Information

- Sales personnel are provided with confidential company information to use only for legitimate business purposes. This information includes sales and marketing strategies, Lilly personnel and customer information, resource allocations, and information from the Premier system, including data from IMS Health (e.g., prescription, Arrow and DDD data).

- In compliance with the Global Policy on Company and External Party Information Assets, employees must take precautions to avoid disclosing company confidential information, intentionally or unintentionally, to unauthorized third parties unless prior legal approval has been obtained. Employees may share confidential company information only with other Lilly personnel or authorized third parties (e.g., joint venture partners) who need the information to successfully conduct Lilly business.

- Employees must retain confidential company information according to company record retention policies.

- Employees must comply with all confidentiality obligations regarding IMS Health data. Employees must not, under any circumstances, disclose or discuss the data with anyone except other Lilly employees, IMS Health, or third parties for whom IMS Health has granted written permission for such disclosure. Employees must not share IMS data with any external party.

- Employees must respect and abide by the wishes of any HCP who asks that his/her prescriber data not be made available to company sales representatives. (For more information, contact the Director of Business Reporting.)

---

Policy Owner & Contact: Click here
Policy Effective Date: 18 May 2010
Last Reviewed Date: April 2010
Version: 2.0

NOTE: If you are using a printed copy of this document, verify that the version number is consistent with the current version available at the Ethics and Compliance LillyNet site

---

CONFIDENTIAL
Eli Lilly and Company

US Policy on Documenting a Sales Call
Page 2 of 2

Confidential

LLY-ROD0001139